DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:    VLADISLAV VAINBERG
       Assistant United States Attorney
       26 Federal Plaza, 38th Floor
       New York, New York 10278
       (212) 637-1029

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>$3,435,676.57 IN UNITED STATES CURRENCY HELD IN GENERAL LEDGER ACCOUNT NO. 4050720 AT WELLS FARGO BANK, N.A., FORMERLY ON DEPOSIT IN ACCOUNT NO. 2502560838 ASSOCIATED WITH OCEAN STUDIOS CALIFORNIA LLC, AND ANY AND ALL FUNDS TRACEABLE THERETO, INCLUDING ACCRUED INTEREST,<br><br>Defendant-*in-rem*. | VERIFIED CIVIL COMPLAINT FOR FORFEITURE<br><br>24 Civ.  9189 |

Plaintiff United States of America, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, for its verified civil complaint, alleges, upon information and belief, as follows:

## I. <u>JURISDICTION AND VENUE</u>

1.      This action is brought pursuant to Title 18, United States Code, Section 981(a)(1)(C) by the United States of America seeking the forfeiture of the following:

a.    Approximately $3,435,676.57 in United States currency held in General Ledger Account No. 4050720 (the "General Ledger Account") at Wells Fargo Bank, N.A. ("Wells Fargo"), and formerly on deposit in Account 2502560838 associated with Ocean Studios California LLC, and any and all funds traceable thereto, including accrued interest  (the "Defendant-*in-rem*").

2.    This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.    Venue is proper pursuant to Title 28, United States Code, Section 1355 (b)(1)(A) because some of the acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4.    As set forth below, there is probable cause to believe that the Defendant-*in-rem* is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) as proceeds of violations of and conspiracies to violate 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and Title 31, Code of Federal Regulations § 589.201 (the International Emergency Economic Powers Act ("IEEPA") and orders and regulations issued thereunder pertaining to the national emergency with respect to Ukraine) (the "Subject Offenses").

## II. PROBABLE CAUSE FOR FORFEITURE

Legal Background as to the Subject Offenses

5.    The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President of the United States authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation,

or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

6.    In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine.  To address this national emergency, the President blocked all property and interest in property—that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person—of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria.  These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities.  Executive Order 13660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person.

7.    The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and it was most recently continued on March 4, 2024.

8.    On multiple occasions, the President has expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the

actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are still in effect and are collectively referred to as the "Ukraine-Related Executive Orders."

9.      The Ukraine-Related Executive Orders authorize the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders.  The Ukraine-Related Executive Orders further authorize the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

10.     To implement the Ukraine-Related Executive Orders, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") issued certain regulations, referred to as the Ukraine-Related Sanctions Regulations.  These regulations incorporate by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests in property are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDNs") and Blocked Persons List (the "SDN List"), which is published on OFAC's website.  *See* 31 C.F.R. § 589.201. n.1.

11.     Under the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406; 31 C.F.R. §§ 589.201, 589.303 & note 1, and 589.411. Accordingly, such an entity is deemed a person whose

property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *Id*.

Probable Cause Regarding the Subject Offenses

12. This action arises out of an FBI investigation (the "Investigation") into OFAC-sanctioned Russian national Oleg Vladimirovich Deripaska's links to the United States and the U.S. financial system, and sanctions-violative activity by Deripaska and others in support of his interests.

13. On or about April 6, 2018 (the "Designation Date"), OFAC designated Deripaska as an SDN pursuant to Executive Order 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, as well as pursuant Executive Order 13662 for operating in the energy sector of the Russian Federation economy. *See* U.S. Dep't of Treasury, Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List, available at https://www.treasury.gov/ofac/downloads/sdnlist.pdf (accessed November 18, 2024). On or about the same date, OFAC also designated Basic Element Limited, EN+ Group and other entities for being owned or controlled by, directly or indirectly, Deripaska.

<u>The Schemes to Evade United States Sanctions on Deripaska</u>

14. The FBI's investigation into Deripaska has included, among other topics, services provided by U.S. citizen Olga Shriki, and others, to and for the benefit of Deripaska and certain Deripaska-owned entities.

15. On September 29, 2022, S1 Indictment 22 Cr. 518 was unsealed, returned by a grand jury sitting in the Southern District of New York, charging Deripaska, Shriki, and Natalia Mikhaylovna Bardakova with, *inter alia*, a conspiracy to violate sanctions in violation of

5

50 U.S.C. § 1705 and the Ukraine-Related Sanctions Regulations (the "Deripaska Indictment"). A copy of the Deripaska Indictment is attached hereto as Exhibit A and incorporated by reference.[1]

  16.  As relevant here, the Deripaska Indictment set forth the following:

    a. For over four years after Deripaska was sanctioned in 2018, and in violation of those sanctions, Shriki worked for Deripaska to provide services for his benefit in the United States, and was paid by Deripaska, in violation of the Ukraine-Related Sanctions Regulations. *See* Deripaska Indictment ¶¶ 1-6, 15-19;

    b. Deripaska used Shriki's assistance to engage in several endeavors in the United States in violation of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations, including:

      i. In or about December 2019, SHRIKI facilitated the sale of a music studio in Burbank, California (the "Music Studio") for the benefit of DERIPASKA, who owned and controlled the Music Studio through a series of corporate entities. SHRIKI then attempted to expatriate the proceeds of the sale, approximately $3,078,787, from an account at Wells Fargo, held in the name of Ocean Studios LLC, to a bank account in Russia belonging to a DERIPASKA-controlled entity. Deripaska Indictment ¶ 19(a).

      ii. Subsequent to the sale of the Music Studio, in or about 2020, Shriki and Bardakova helped Deripaska to send Voronina from Russia to the United States, so she could give birth to Deripaska and Voronina's child in the United States. Deripaska Indictment ¶ 1.

---

[1] The Deripaska Indictment also separately charged Shriki with destruction of records, in violation of 18 U.S.C. § 1519, Bardakova with making false statements, in violation of 18 U.S.C. § 1001, and a fourth defendant, Ekaterina Voronina with separately making false statements in violation of 18 U.S.C. § 1001.

iii.  Shriki orchestrated hundreds of thousands of dollars worth of U.S. medical care, housing, childcare, and other logistics to aid Deripaska and Voronina's efforts to have Voronina give birth in the United States, which resulted in the child receiving U.S. citizenship.  *Id.*

iv.  Later, in or about 2022, at Deripaska's further behest and for his further benefit, Shriki and Bardakova attempted to facilitate Voronina's return to the United States to give birth to Deripaska and Voronina's second child.  *Id.*

v.  Additionally, between in or about 2018 and in or about 2020, Deripaska routinely had Shriki and Bardakova purchase various products in the United States for Deripaska's personal use and as gifts for others on his behalf.  *Id.*

vi.  At all relevant times, several other properties originally purchased by Deripaska in the United States, including properties located at 2501 30th Street NW, Washington D.C.; 12 Gay Street, New York, New York; and 11 East 64th Street, New York, New York (collectively, the "U.S. Properties"), were maintained on Deripaska's behalf.  Deripaska Indictment ¶ 2.  As further alleged, the U.S. Properties purchased by Deripaska were collectively worth tens of millions of dollars, and at all relevant times were managed by a company named Gracetown, Inc.  *Id.* ¶ 6.  Since OFAC imposed sanctions on Deripaska on or about April 6, 2018, individuals associated with and/or entities controlled by Deripaska transmitted millions of dollars to bank accounts held by Gracetown Inc. in Manhattan for the upkeep of the U.S. Properties and for the benefit of Deripaska.  *Id.*

17.  On or about October 11, 2022, Indictment 22 Cr. 503 (PAE) (the "Bonham-Carter Indictment") was unsealed, returned by a grand jury sitting in the Southern District of New York, charging Graham Bonham-Carter with participating in a conspiracy to violate IEEPA and

7

with a substantive violation of IEEPA by providing services in the United States for the benefit of Deripaska—including by sending over a million dollars into the United States to upkeep the U.S. Properties.  Bonham-Carter was also charged with engaging in wire fraud by attempting to expatriate artwork belonging to Deripaska from an auction house in the United States through misrepresentations.  The Bonham-Carter Indictment is attached hereto as Exhibit B and incorporated by reference.

<u>The Scheme to Sell the Music Studio and Transfer the Proceeds</u>

18.    The Investigation has revealed the following regarding the Music Studio:

a.    The Music Studio is a music studio named Ocean Studios Burbank, located at 435 South San Fernando Boulevard, Burbank, California.  The Music Studio was purchased in or about January 2008 by a shell entity named Ocean Studios California LLC, registered in California.  The escrow settlement statement recited that a deposit of approximately $3.1 million was made from Tangril Equities LTD toward the purchase.

b.    The Limited Liability Company Agreement for Ocean Studios California LLC listed only a single member: Ocean Studio Ltd. ("Studio Ltd."), an entity registered in the British Virgin Islands on or about June 26, 2007, for which Deripaska's cousin Pavel Ezubov signed as the director and whose formation documents state that its initial 100 shares were issued "in favour of Oleg Vladimirovich Deripaska."

c.    In a separate Declaration of Trust, dated April 27, 2018, *i.e.*, several weeks following the Designation Date, an entity named Hospina Limited in the British Virgin Islands, took control of the shares of Studio Ltd.  On the Declaration of Trust, an individual ("Individual-1") signed as the Nominee and Trustee, and Ezubov signed as the Ultimate Beneficial Owner.

d.      Ezubov is a cousin of Deripaska.  Ezubov has not been designated as an SDN in the United States, but has been sanctioned by multiple foreign jurisdictions, including the United Kingdom and Canada.  On information and belief, Ezubov has acted as a proxy for Deripaska in connection with the transactions described herein.

e.      A review in November 2024, of the U.K. Beta Companies House, which is a publicly available corporate database, discloses Ezubov as a person of significant control and director of an entity named Terra Services Limited.  In early 2018, Deripaska was also listed as a person of significant control of Terra Services Limited.  A change in control from Deripaska to Ezubov was filed on or about April 23 and 24, 2018, several weeks subsequent to the Designation Date, purportedly effective on January 25, 2018.  In addition, in or about January 2017, Terra Services Limited filed a financial disclosure report, authorized and signed by Ezubov.  Related party transactions listed in the report included Taviner Limited and Tangril Equities Ltd. (*see supra* ¶ 18.a), and the report set forth that Deripaska controlled both Taviner Limited and Tangril Equities Ltd.  Terra Services Limited listed the company's immediate parent company as Sparticle Limited ("Sparticle").  Sparticle, incorporated in Cyprus, identified its ultimate parent company as Cofido, Ltd., a company incorporated in the British Virgin Islands, in the same report.  Finally, the report stated that Deripaska was the ultimate controlling party of all the aforementioned entities.

f.      Between in or about 2013 and in or about 2018, Olga Shriki lived in the United States and worked for Basic Element in its Manhattan office.  *See supra* ¶ 13.  As described in more detail below, before and after the Designation Date, Shriki and Ezubov, among others, helped to operate and fund the Music Studio on behalf of Deripaska, and made clear that Deripaska was the ultimate decisionmaker with regard to the Music Studio.

9

g.     For example, in or about February 2014, a consultant of Basic Element ("Consultant-1") e-mailed Ezubov and Shriki regarding "crises at Ocean" after the resignation of an employee ("Employee-1") and advised on a potential option to "Close down Ocean and liquidate all the assets before they disappear."  Ezubov wrote back in part, "I sent e-mail to Oleg this morning describing the situation and asking his decision.  As soon as I'll get feedback from him I'll let you know." Ezubov further stated that a musician ("Musician-1") who prompted the Music Studio crisis was "damaging Oleg's business by doing all that."  As noted, "Oleg" is the first name of Deripaska.  On information and belief, the references to "Oleg" in this exchange and that discussed *infra* at ¶ 18.h, refer to Oleg Deripaska, and the references to "Ocean" in this exchange refer to the Music Studio.

h.     In a subsequent e-mail in or about February 2014, Consultant-1 emailed Ezubov explaining that Consultant-1 "can not deliver this message to Musician-1 as he knows Oleg is the final decision maker….You must speak assertively on behalf of Oleg or no doubt the next move will be closing the studio." On information and belief, the reference to "Oleg" in this exchange refers to Oleg Deripaska.

i.     In another example, on or about September 26, 2014, Shriki emailed an employee asking about the financial situation at the Music Studio, requesting an update as soon possible because "Mr. D is in town and he will ask me about this, most likely."  On information and belief, based on a review of other communications, the reference to "Mr. D" in this exchange refers to Deripaska.

j.     In or about March 2016, Shriki corresponded directly with Ezubov and Musician-1 about the alleged theft of Musician-1's equipment from the Music Studio that Deripaska offered to reimburse.  Musician-1 wrote in part, "I was informed that OVD would

10

reimburse me personally for the items taken. That wasn't an acceptable solution to the problem and I was unwilling to take money directly from OVD."  On information and belief, the reference to "OVD" in this exchange refers to Oleg Vladimirovich Deripaska.

k.      Following OFAC's designation of Deripaska and Basic Element on or about April 6, 2018, Shriki helped to wind down the Manhattan office of Basic Element, and continued to work for the benefit of Deripaska, including with respect to operations of the Music Studio.

l.      At all relevant times, Ocean Studios California LLC held a bank account at Wells Fargo under account number 2502560838 (the "Ocean Studios Account"). Between in or about July 2015 and in or about June 2019, the Ocean Studios Account received more than ten overseas transfers of funds, used to cover the costs associated with operating the Music Studio.  The first five transfers – two in the second half of 2015 and three in 2016, totaling approximately $460,000 – originated from a Latvian bank account under the name Tangril Equities Ltd, the same entity identified as being controlled by Deripaska in the Terra Services filings in January 2017, *see supra* ¶ 18.e.

m.      On or about February 12, 2018, the Ocean Studios Account received a $32,000 transfer arrived from a different Latvian bank account held under the name Hospina Ltd. *See supra* ¶ 18.c.

n.      In or about July 2018, approximately three months after OFAC designated Deripaska as an SDN, Shriki created a consulting business named Global Consulting Services LLC ("GCS").  Through GCS, Shriki coordinated with associates of Deripaska, including Ezubov and Bardakova, to continue providing services to and for the benefit of Deripaska and to continue receiving funds from Deripaska or entities controlled by Deripaska.  GCS opened a bank

account (the "GCS Account") at a bank ("Bank-2") in Manhattan.  Between August 2018 and September 2019, the GCS Account received wires totaling over $500,000 from two entities associated with Deripaska, one of which entered into a separate agreement with Graham Bonham-Carter to manage other Deripaska properties abroad after the Designation Date, and a second entity that was recognized for making charitable contributions on behalf of Deripaska after the Designation Date, with Deripaska's knowledge.

o.    Shriki was aware of the negative impact the sanctions had on the funding of the Music Studio's operations.  In an email to an accounting firm for the Music Studio on or about October 3, 2018, Shriki stated, "[t]he management was made aware of the money crisis in the studio and we are working to find a viable solution as you already know the transfers from Russia aren't possible currently."

p.    After Deripaska's designation, the Ocean Studios Account did not receive any additional transfers from Tangril Equities Ltd or Hospina Ltd.  Instead, five transfers in 2018 and 2019 totaling in excess of $180,000 came from a Russian bank account held under the name Sparticle.  As described above, *see supra* ¶ 18.e, a financial disclosure report filed on behalf of Terra Services in January 2017 listed Deripaska as the controlling party of this entity; according to a purported Cypriot certificate dated May 8, 2019, Ezubov was the sole shareholder of Sparticle, a Cyprus-registered company as of that date.

q.    Beginning in July 2019, the Ocean Studios Account ceased receiving funding from Sparticle and instead received transfers from Shriki's GCS Account held at Bank-1 in Manhattan, which in turn was funded by overseas accounts tied to Deripaska, as noted above.  GCS made transfers to the Ocean Studios Account on or about July 15, July 16, and October 10 of 2019, totaling $69,000.

r.      In addition to funding the Music Studio, Shriki's GCS Account received funding from Deripaska in support of other sanctions-violative conduct described in the Deripaska Indictment.  For example, as coordinated by indicted co-conspirator Natalia Bardakova, Shriki used some of the $170,000 in payments to her GCS Account to pay for, or reimburse herself for the payment of, rent for the lease of a penthouse, medical providers, nannies, transportation, and other expenses for the benefit of Deripaska, in particular, related to Deripaska's child. *See* Deripaska Indictment ¶ 19.

s.      In 2019, more than a year after the Designation Date, while employed by Deripaska, Shriki assisted with the sale of the Music Studio by Ocean Studios California LLC in various ways, such as preparing the property for sale, coordinating with the accounting firm for the Music Studio, communicating with the real estate broker to approve the sale, facilitating the payment of outstanding taxes and bills for the Music Studio, signing over the property deed, and liquidating the other assets in the Music Studio.

t.      Indeed, on or about July 2, 2019, a statement of information was filed with the California Secretary of State listing the principal office and mailing address of Ocean Studios California LLC as a particular address on Fifth Avenue in Manhattan which is an office space address Shriki used for GCS business.  As described above, GCS had been funded by overseas accounts associated by Deripaska earlier in the year.

u.      As stated *supra*, Shriki assisted with the sale of the Music Studio for the benefit of Deripaska.  For example, on or about June 11, 2019, Shriki responded to an e-mail chain in which earlier, on or about June 10, 2019, Musician-1 had reiterated a claim for compensation for lost belongings in the Music Studio, and expressed that in the past, reimbursement for lost belongings would come from "our friend (O) and that he ["O"] would be

writing the restitution check and I [the artist] would be the payee." Shriki responded that Musician-1 should provide a list of property and proof of purchase in order to facilitate reimbursement. On information and belief, the term "O" in this exchange refers to Oleg Deripaska.

    v. Shriki also effectuated a sale of the contents of the Music Studio in the summer of 2019 in excess of $500,000 as reflected in a purchase agreement dated June 5, 2019 between Ocean Studios California LLC and a buyer. The GCS Account in Manhattan received two credits in June 2019 totaling $510,500 with descriptions that referenced payment for work done for Ocean Studios California LLC.

    w. On or about September 12, 2019, Shriki e-mailed a real estate services firm a copy of a letter of authorization signed by Ezubov, which authorized GCS to represent and sign on behalf of the Music Studio in all transactions related to the sale of the studio, building, and equipment.

    x. On or about November 12, 2019, a representative of the same real estate firm emailed Shriki and other employees of the real estate firm to finalize logistics and documentation regarding closing on the sale of the Music Studio. The e-mail stated that once the closing was completed, the payment for the purchase of the building was to be sent via FedEx to GCS to the attention of Shriki.

    y. On or about December 3, 2019, the Music Studio was sold to a buyer (the "Buyer") by Ocean Studios California LLC for $3,350,000. On or about the same date, the Los Angeles County Clerk's Office received a deed transfer reflecting the transfer of the Music Studio from Ocean Studios California LLC to the Buyer.

z.    The net proceeds from the sale of the Music Studio amounted to $3,100,909.89.  On or about December 6, 2019, an escrow check for $3,100,909.89 from an escrow service was deposited into the Ocean Studios Account.

aa.    During the year 2020, while Shriki was employed by Deripaska and continued to perform services for Deripaska (as described in the Deripaska Indictment), Shriki requested that an accounting firm transfer the proceeds from the sale of the Music Studio to the bank account in Russia held under the name Sparticle—the same name of the entity that funded the Music Studio's accounts after the Designation Date—or, in the alternative, requested that the accounting firm add Shriki as a signatory on the bank account for the Music Studio so that Shriki could effectuate the transfer of funds on behalf of the owner.  The firm declined to effectuate the wire transfer itself.

bb.    On or about July 16, 2020, in an effort to have Wells Fargo wire the proceeds out of the Ocean Studios Account, Shriki emailed Wells Fargo an Amended and Restated Limited Liability Company Agreement of Ocean Studios California LLC dated July 15, 2020, purportedly signed by Ezubov, which recited that Olga Shriki was appointed as an officer of the Ocean Studios California LLC, and that the sole member of that entity was Studio Ltd., with a mailing address care of GCS in Manhattan, in the Southern District of New York.

cc.    On or about July 23, 2020, Shriki emailed a set of formation documents for Studio Ltd., which she identified as the member of Ocean Studios California LLC to Wells Fargo, which documents (dated June 26, 2007) indicated that while Ezubov was the director, all the shares of Studio Ltd. would be issued in favor of Deripaska.  Representatives of Wells Fargo instructed Shriki that Ezubov would need to conduct the requested transaction in-person.  Shriki subsequently advised Wells Fargo that Ezubov, as director of Studio Ltd., would

15

be unable to come to the United States to accomplish the requested transaction at Wells Fargo in-person.

dd.    In or about March 2021, Wells Fargo made the determination to block the Ocean Studios Account and the funds on deposit due to the Ocean Studios Account's relationship with Deripaska.   The blocked account balance at that time, $3,083,370.71, was transferred by Wells Fargo to an internal Wells Fargo general ledger account numbered 4050720, *i.e.* the General Ledger Account.

ee.    As of November 15, 2024, the balance of the Ocean Studios Account blocked funds in the General Ledger Account, internally designated with BRRTS Reference number 2502560838, was $3,435,676.57.

19.    An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. Willfully transacting with, on behalf of, or for the benefit of, an individual or entity on the SDN List without first obtaining a license from OFAC is a criminal violation of IEEPA, 50 U.S.C. §§ 1705(a) & (c).  At no point did Deripaska or anyone acting on his behalf obtain an OFAC license to engage in U.S. financial transactions with respect to maintaining or selling the Music Studio.

20.    Based on the foregoing, there exists probable cause to believe that the Music Studio and its contents were blocked property sold after the Designation Date in violation of sanctions, and that the balance of funds in the Ocean Studios Account transferred by Wells Fargo to the General Ledger Account are the proceeds of that violation.

### III.  CLAIMS FOR FORFEITURE

### Claim One

### Forfeiture Under 18 U.S.C. § 981(a)(1)(C)
### (Proceeds Traceable to Violations of IEEPA)

21.     Paragraphs 1 through 20 of this Complaint are repeated and re-alleged as if fully set forth herein.

22.     Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

23.     As defined in 18 U.S.C. § 1956(c)(7), "specified unlawful activity," includes, among other things, a violation of "section 206 (relating to penalties) of the International Emergency Economic Powers Act," which is codified at Title 50, United States Code, Section 1705.

24.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 50, United States Code, Section 1705, or as property traceable to such property.

### Claim Two

### Forfeiture Under 18 U.S.C. § 981(a)(1)(C)
### (Proceeds Traceable to IEEPA Conspiracy)

25.     Paragraphs 1 through 20 of this Complaint are repeated and re-alleged as if fully set forth herein.

17

26.     Title 18, United States Code, Section 981(a)(1)(C), subjects to civil forfeiture:

> Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

27.     As defined in 18 U.S.C. § 1956(c)(7), "specified unlawful activity," includes, among other things, a violation of "section 206 (relating to penalties) of the International Emergency Economic Powers Act," which is codified at Title 50, United States Code, Section 1705.

28.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a conspiracy to violate Title 50, United States Code, Section 1705, or as property traceable to such property.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant Plaintiff such further relief as this Court

may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      December 2, 2024

                             DAMIAN WILLIAMS
                             United States Attorney for the
                             Southern District of New York
                             Attorney for the Plaintiff
                             United States of America

By:     _____
                             VLADISLAV VAINBERG
                             Assistant United States Attorney
                             26 Federal Plaza, 38th Floor
                             New York, New York 10278
                             Telephone: (212) 637-1029

19

**VERIFICATION**

STATE OF NEW YORK                    )
COUNTY OF NEW YORK              :
SOUTHERN DISTRICT OF NEW YORK   )

          Lauren Turczak, being duly sworn, deposes and says that she is a Special Agent

with the Federal Bureau of Investigation (the "FBI"), and as such has responsibility for the

within action; that she has read the foregoing complaint and knows the contents thereof, and that

the same is true to the best of her knowledge, information, and belief.

          The sources of deponent's information and the ground of her belief are official

records and files of the FBI, information obtained directly by the deponent, and information

obtained by other law enforcement officials, during an investigation of alleged violations of Title

18 and Title 50 of the United States Code.

                            /s/ Lauren Turczak
                            LAUREN TURCZAK
                            Special Agent
                            Federal Bureau of Investigation

# EXHIBIT A

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x
                       :

UNITED STATES OF AMERICA       :   SEALED INDICTMENT

                       :

       -v.-          :   S1 22 Cr.

                       :

OLEG VLADIMIROVICH DERIPASKA,   :
 a/k/a "Oleg Mukhamedshin,"    :
OLGA SHRIKI,             :
NATALIA MIKHAYLOVNA BARDAKOVA,  :
 a/k/a "Natalya Mikhaylovna Bardakova," :   CRIM 518
and                 :
EKATERINA OLEGOVNA VORONINA,   :
 a/k/a "Ekaterina Lobanova,"   :

                       :

          Defendants.    :

                       :

- - - - - - - - - - - - - - - - - - - - x

The Grand Jury charges:

### Overview

1. On or about April 6, 2018, the United States government imposed sanctions on Russian citizen OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, and a company he controlled called "Basic Element." Among other things, those sanctions prohibited making any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked, and receiving any contribution or provision of funds, goods, or services from any such person. Yet for over four years afterwards, and in violation of those sanctions, DERIPASKA continued to retain OLGA SHRIKI and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya

Mikhaylovna Bardakova," the defendants, to provide hundreds of thousands of dollars worth of services for his benefit in the United States. For example, in or about 2019, SHRIKI facilitated for DERIPASKA's benefit the sale of a music studio in California for approximately $3,078,787. Then, in or about 2020, SHRIKI and BARDAKOVA helped EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," the defendant, travel from Russia to the United States, so she could give birth to DERIPASKA's and VORONINA's child in the United States. SHRIKI orchestrated hundreds of thousands of dollars worth of U.S. medical care, housing, childcare, and other logistics to aid DERIPASKA's and VORONINA's efforts to have VORONINA give birth in the United States, which resulted in the child receiving U.S. citizenship. Later, in or about 2022, at DERIPASKA's further behest and for his further benefit, SHRIKI and BARDAKOVA attempted to facilitate VORONINA's return to the United States to give birth to DERIPASKA's and VORONINA's second child. Additionally, between in or about 2018 and in or about 2020, DERIPASKA routinely had SHRIKI and BARDAKOVA purchase various products in the United States for DERIPASKA's personal use and as gifts for others on his behalf. During the course of law enforcement efforts to investigate the scheme, SHRIKI destroyed evidence, while BARDAKOVA and VORONINA made false statements to U.S. government officers.

2

## The Defendants and Relevant Entities

2.   OLEG   VLADIMIROVICH   DERIPASKA,   a/k/a   "Oleg
Mukhamedshin," the defendant, is a Russian national.  At all times
relevant  to  this  Indictment,  DERIPASKA  was  the  owner  and
controller,  directly  or  indirectly,  of  Basic  Element  Limited
("Basic Element"), a private investment and management company for
DERIPASKA's various business interests.  As set forth in greater
detail below, on or about April 6, 2018, the United States
Department of the Treasury's Office of Foreign Assets Control
("OFAC") designated DERIPASKA as a Specially Designated National
("SDN"), in connection with its finding that the actions of the
Government of the Russian Federation with respect to Ukraine
constitute an unusual and extraordinary threat to the national
security and foreign policy of the United States (the "OFAC
Sanctions").   In so designating DERIPASKA, OFAC explained that
DERIPASKA was sanctioned for having acted or purported to act for
or on behalf of, directly or indirectly, a senior official of the
Government of the Russian Federation, as well as for operating in
the energy sector of the Russian Federation economy.  On or about
the same date, OFAC also designated Basic Element.  At all times
relevant  to  this  Indictment,  several  properties  originally
purchased by DERIPASKA in the United States, including properties
located at 2501 30th Street NW, Washington D.C.; 12 Gay Street,
New York, New York; and 11 East 64th Street, New York, New York

(collectively, the "U.S. Properties"), were maintained on his behalf.

3.    OLGA SHRIKI, the defendant, is a naturalized United States citizen living in the United States.  At all times relevant to this Indictment, SHRIKI provided services to, and for the benefit of, OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, including, for a period of time, as an employee of DERIPASKA, or entities controlled by DERIPASKA. Between in or about April 2018 and in or about 2021, despite knowledge of the OFAC Sanctions imposed on DERIPASKA, SHRIKI continued to provide services to, and for the benefit of, DERIPASKA and received funds from entities controlled by DERIPASKA, including in connection with facilitating the sale of one of DERIPASKA's holdings in the United States, gift deliveries on behalf of DERIPASKA in the United States, and the birth of DERIPASKA's first child in the United States.

4.    NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendant, is a Russian national.  At all times relevant to this Indictment, BARDAKOVA worked for OLEG VLADMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, or entities controlled by DERIPASKA, and otherwise provided services to, and for the benefit of, DERIPASKA.  Between in or about April 2018 and in or about 2022, despite knowledge of the OFAC Sanctions imposed on DERIPASKA, BARDAKOVA continued to

4

provide services to and for the benefit of DERIPASKA, including in
connection with gift deliveries on behalf of DERIPASKA in the
United States, the birth of DERIPASKA's first child in the United
States, and the planned birth of DERIPASKA's second child in the
United States.

5. EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina
Lobanova," the defendant, is a Russian national. Since in or about
2015, VORONINA has been in an intimate relationship with OLEG
VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant.
Between in or about July 2020 and in or about December 2020,
VORONINA flew on a private jet funded by DERIPASKA to the United
States so that she could give birth in the United States to
DERIPASKA's child, who thereby became a U.S. citizen. In doing
so, VORONINA and DERIPASKA engaged OLGA SHRIKI and NATALIA
MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the
defendants, to undertake hundreds of thousands of dollars in
transactions in furtherance of the scheme and in violation of U.S.
sanctions. Later, in or about 2022, VORONINA and DERIPASKA agreed
to and did attempt to re-engage SHRIKI in connection with the
planned U.S. birth of their second child, but ultimately engaged
BARDAKOVA instead. In or about June 2022, VORONINA flew to the
United States on another private jet funded by DERIPASKA. Upon
arrival, VORONINA made multiple false statements to, and tried to
mislead, officers of the Department of Homeland Security, in an

attempt to prevent the officers from learning DERIPASKA's name and to conceal the roles of DERIPASKA, SHRIKI, and BARDAKOVA in hundreds of thousands of dollars of illegal transactions in violation of U.S. sanctions. VORONINA was refused entry to the United States.

6. The U.S. Properties were purchased by OLEG VLADMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, between in or about 2005 and in or about 2008. Collectively worth tens of millions of dollars, the U.S. properties were at all relevant times managed by a company named Gracetown, Inc. Since OFAC imposed sanctions on DERIPASKA on or about April 6, 2018, individuals and/or entities controlled by DERIPASKA transmitted millions of dollars to bank accounts held by Gracetown Inc. in Manhattan for the upkeep of the U.S. Properties and for the benefit of DERIPASKA. Gracetown Inc. used the funds to pay for various expenses associated with the U.S. Properties, including staff salaries, property taxes, and other services, and to maintain the U.S. Properties.

## The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations

7. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign

policy of the United States.  Section 1705 provides, in part, that
"[i]t shall be unlawful for a person to violate, attempt to
violate, conspire to violate, or cause a violation of any license,
order, regulation, or prohibition issued under this chapter."  50
U.S.C. § 1705(a).

8.   In 2014, pursuant to his authorities under the
IEEPA, the President issued Executive Order 13660, which declared
a national emergency with respect to the situation in Ukraine.  To
address this national emergency, the President blocked all
property and interest in property that were then or thereafter
came within the United States or that were then or thereafter came
within the possession or control of any United States person, of
individuals determined by the Secretary of the Treasury to meet
one or more enumerated criteria.  These criteria include, but are
not limited to, individuals determined to be responsible for or
complicit in, or who engage in, actions or policies that threaten
the peace, security, stability, sovereignty, or territorial
integrity of Ukraine; or who materially assist, sponsor, or provide
financial, material, or technological support for, or goods or
services to, individuals or entities engaging in such activities.
Executive Order 13660 prohibits, among other things, the making of
any contribution or provision of funds, goods, or services by, to,
or for the benefit of any person whose property and interests in
property are blocked, and the receipt of any contribution or

provision of funds, goods, or services from any such person.

9. The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2021.

10. The President on multiple occasions expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders." Additionally, Executive Order 14065, issued on February 21, 2022, expanded the scope of the national emergency, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic or Luhansk People's Republic regions of Ukraine contradicts Russia's commitments under the Minsk Agreements and further threatens the peace, stability, sovereignty, and territorial integrity of Ukraine.

11. The Ukraine-Related Executive Orders authorized the

Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

12. To implement the Ukraine-Related Executive Orders, OFAC issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the definition of prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the SDN and Blocked Persons List (the "SDN List"), which is published on OFAC's public website. *See* 31 C.F.R. § 589.201 n.1.

13. According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R.

§ 589.406.  Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List.  *See* 31 C.F.R. § 589.406.

14.  On or about April 6, 2018, OFAC designated OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, as an SDN pursuant to the Ukraine-Related Executive Orders.  In particular, OFAC designated DERIPASKA pursuant to Executive Order 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, as well as pursuant Executive Order 13662 for operating in the energy sector of the Russian Federation economy. On or about the same date, OFAC also designated Basic Element for being owned or controlled by, directly or indirectly, DERIPASKA. As OFAC explained, Basic Element is a private investment and management company for DERIPASKA's various business interests.

**SHRIKI and BARDAKOVA's Work for DERIPASKA Post-Sanctions**

15.  Between in or about 2013 and in or about 2018, OLGA SHRIKI, the defendant, lived in the United States and worked for Basic Element in its Manhattan office.  Following OFAC's designation of OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, and Basic Element on or about April 6, 2018, SHRIKI helped to wind down the Manhattan office of Basic Element, and continued to work for the benefit of DERIPASKA.  On

or about July 13, 2018, SHRIKI emailed herself a document entitled "Olga Shriki Functional Responsibilities May 2018.docx," which listed SHRIKI as a "Trusted contact for any assignments by OVD". "OVD" are DERIPASKA's initials.  The document also states that SHRIKI's job responsibilities included "[s]earching for and locating necessary items as requested by OVD or his team members".

16.  In or about July 2018, after OFAC designated OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, as an SDN, OLGA SHRIKI, the defendant, created a consulting business named Global Consulting Services LLC ("Global Consulting").  Through Global Consulting, SHRIKI coordinated with NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendant, to continue providing services to and for the benefit of DERIPASKA and to continue receiving funds from DERIPASKA or entities controlled by DERIPASKA.

17.  During the relevant period, OLGA SHRIKI, the defendant, had knowledge of the OFAC sanctions imposed on OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant. For example:

a.     On or about April 6, 2018, SHRIKI received a text message with a link to the U.S. Treasury Department's announcement of the imposition of sanctions on DERIPASKA.  SHRIKI replied, in part and substance, that the sanctions were likely to impact her work.

11

b.      On or about January 18, 2020, SHRIKI had a conversation with an individual. SHRIKI made an audio recording of the conversation, during which she explained to the individual, in part, that, "My clients are from [Moscow] but right now, because of the sanctions I can't work with some of them.  And that was a very influential relationship . . . So as a United States citizen I can't work with somebody, it's against the law. . . . It's United States law.  You can't work for people who are under United States sanctions.  So I don't. . . . . So if someone's on the blocked list, you can't."  Despite this knowledge, and subsequent to this conversation, SHRIKI received over a hundred thousand dollars to provide services to and for the benefit of DERIPASKA.

18.  During the relevant period, NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendant, had knowledge of the sanctions imposed on DERIPASKA.  For example:

a.   On or about December 10, 2018, BARDAKOVA accessed a news article discussing efforts to "save Russian oligarch Oleg Deripaska's empire from the clutches of the US Office of Foreign Assets Control."

b.   On or about September 1, 2020, BARDAKOVA accessed a document called "List of Sanctioned Companies"[1] that included "EN+", with the notation "Linked to Deripaska, Oleg

_____

[1] Documents and communications in Russian cited in this Indictment have been translated into English as draft translations.

Vladimirovich", and "Agroholding Kuban", with the notation "part of group 'Basic Element' of O. Deripaska."

### The Sanctions Violations

19.  From at least in or about 2019 through in or about 2022, OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, employed OLGA SHRIKI and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendants, to provide funds, goods, and services to and for the benefit of DERIPASKA and companies owned and controlled by DERIPASKA, and to receive funds, goods, and services from DERIPASKA.  DERIPASKA continued to receive funds, goods, and services from SHRIKI, assisted by BARDAKOVA, and to provide funds, goods, and services to SHRIKI and other United States persons by and through BARDAKOVA, after being designated as an SDN in or about April 2018 and in violation of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations, until at least June 2022.  In particular, DERIPASKA, the defendant, used SHRIKI's and BARDAKOVA's assistance to engage in several endeavors in the United States in violation of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations, including:

a.      In or about December 2019, SHRIKI facilitated the sale of a music studio in Burbank, California (the "Music Studio") for the benefit of DERIPASKA, who owned and controlled the Music Studio through a series of corporate entities.

13

SHRIKI then attempted to expatriate the proceeds of the sale, approximately $3,078,787, from an account at Wells Fargo Bank, held in the name of Ocean Studios LLC, to a bank account in Russia belonging to a DERIPASKA-controlled entity.

           b.         Between in or about May 2018 and in or about 2020, BARDAKOVA instructed SHRIKI to purchase and send flower and gift deliveries on behalf of DERIPASKA to DERIPASKA's social contacts in the United States and Canada. The deliveries included, among others, two Easter gift deliveries to a U.S. television host, two flower deliveries to a then-former Canadian Parliament member, and two flower deliveries in 2020 to EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," the defendant, while she was in the United States to give birth to DERIPASKA's child. The flower and gift deliveries were often accompanied by notes that identified DERIPASKA as the gifter, such as "Wishing you and your family a beautiful Easter Holiday. Oleg D." or "Best Wishes On Your Birthday. Oleg D."

           c.         In or about 2020, BARDAKOVA instructed SHRIKI to purchase items in the United States for DERIPASKA's personal use, such as iPhones and clothing. In or about December 2020, after VORONINA transported the purchased items back to Russia, BARDAKOVA wrote to SHRIKI inquiring about the iPhones SHRIKI had purchased for DERIPASKA, "I couldn't find the boss's phones. Does [VORONINA] have them?" SHRIKI confirmed that

14

VORONINA had packed them with her personal belongings. Additionally, on or about December 9, 2020, DERIPASKA and BARDAKOVA transmitted between themselves an image of a man photographing himself below the neck in a blue long-sleeved shirt. Approximately 24 minutes later, BARDAKOVA sent the same image to SHRIKI with the message, "Olga, American Eagle wants a lot of units." In a separate message on another occasion, BARDAKOVA sent SHRIKI, who was then living in the United States, an image of an American Eagle branded t-shirt, writing "OV wants these t-shirts, 10 counts, size XL. Could you find them and urgently send them?"

d.      In or about 2020, as the pandemic began and people were worried about the state of hospital care in some areas, DERIPASKA and VORONINA agreed that their child should be born in the United States. DERIPASKA, by and through BARDAKOVA, SHRIKI, and other associates, organized and funded this endeavor, which entailed over $300,000 in transactions in the United States. In or about March 2020, DERIPASKA counseled VORONINA on obtaining a U.S. visa, including by telling her to be "careful" ahead of an interview by U.S. immigration authorities. VORONINA thereafter applied for and obtained a U.S. visa for a purported ten-day tourism visit without disclosing her intent to travel and stay in the United States for approximately six months to give birth to DERIPASKA's child.

e.      Between in or about July 2020 and

15

December 2020, SHRIKI and BARDAKOVA, working at the direction and for the benefit of DERIPASKA and VORONINA, facilitated arrangements for VORONINA to give birth to DERIPASKA's child in the United States. SHRIKI and BARDAKOVA coordinated with various companies and individuals to provide, among other arrangements, (1) registration at the hospital where VORONINA gave birth, (2) obstetrical care while VORONINA was in Los Angeles, California, (3) rental of a two-story penthouse apartment in Beverly Hills, California, where VORONINA stayed for approximately six months (the "Beverly Hills Penthouse"), (4) childcare in the form of at least five nannies and a housekeeper, (5) cord blood and placenta preservation, and (6) VORONINA's arrival and departure from the United States on a private jet.

f.      DERIPASKA approved and provided funding for these arrangements related to the birth in 2020 of his child in the United States. As coordinated by BARDAKOVA on behalf of DERIPASKA, SHRIKI received over $170,000 in payments to her Global Consulting bank account at a U.S. financial institution. SHRIKI used some of these funds to pay for, or reimburse herself for the payment of, rent for the Beverly Hills Penthouse, medical providers, nannies, transportation, and other expenses related to DERIPASKA's child, for the benefit of DERIPASKA and VORONINA. Using funds from her personal bank account in Russia, BARDAKOVA separately caused thousands of dollars of payments to various

service providers for the benefit of DERIPASKA and VORONINA in the United States.

g.        DERIPASKA obtained reports from BARDAKOVA and VORONINA about SHRIKI's services to facilitate the birth of his child.  For example, on or about July 2, 2020, VORONINA arrived in Los Angeles on a private jet approved by DERIPASKA and sent DERIPASKA photos of the Beverly Hills Penthouse SHRIKI and BARDAKOVA had rented for her to stay while in the United States. The next day, on or about July 3, 2020, VORONINA sent DERIPASKA a message, stating, in part, "Now Olga and I are going to drive to see where the clinic is and get a local telephone."   DERIPASKA acknowledged the message.  Later, on or about the same day, SHRIKI sent an audio message to BARDAKOVA reporting on her assistance to VORONINA, including the errands VORONINA had described to DERIPASKA.  On or about July 4, 2020, BARDAKOVA replied to SHRIKI with an audio message stating, in part, "Listen, it's so cool that you sorted out just about everything with her.   That's just excellent, really wonderful, really good.  The dad is happy.  I told him that you are with her, that everything is wonderful, great, that you guys will have an appointment with a doctor there, and he goes, 'Well, good, good. Yes. Keep me informed.'"  SHRIKI replied to BARDAKOVA's message, in part, "Go ahead and praise me there."

h.        DERIPASKA's child was born in August

17

2020, in Los Angeles, California, obtaining U.S. citizenship by birth. DERIPASKA arranged for SHRIKI, BARDAKOVA, and VORONINA to obtain a U.S. passport and U.S. birth certificate for DERIPASKA's child. On or about the date of the child's birth, SHRIKI left an audio message for BARDAKOVA, discussing that the child's last name on the birth certificate would be differentiated from the father's last name by asking whether VORONINA had been "prepared" that "the last name will be different?" SHRIKI also stated that VORONINA had already ordered some custom-made items for the baby with initials embroidered. As evidenced in SHRIKI's emails, SHRIKI had in fact purchased personalized baby clothes and a picture frame to be sent to the Beverly Hills Penthouse with inscriptions including variations of the child's initials and name. Ultimately, on the child's birth certificate, VORONINA omitted the name of the father, DERIPASKA, but spelled the child's last name using a variation of DERIPASKA's surname with a couple of the letters changed and gave the child a middle name that makes clear the father is DERIPASKA.

i. In or about 2022, DERIPASKA and VORONINA decided to have VORONINA give birth to their second child in the United States, the result of which would be that the second child also would have United States citizenship. DERIPASKA once again and in violation of U.S. sanctions authorized transactions related to this endeavor, which included over $400,000 in expenses related to a private charter flight for VORONINA and those accompanying

her from Russia to the United States, a six-month pre-paid house rental in Beverly Hills, and additional pre-paid medical and other expenses.

          j.        On or about April 12, 2022, VORONINA wrote to DERIPASKA inquiring whether she could tell another DERIPASKA employee "to connect with Olga Shriki in connection with our trip?" DERIPASKA replied to VORONINA, "Of course." However, when VORONINA asked SHRIKI to organize everything as was done in connection with the birth of DERIPASKA's first child, including "doctor, clinic, apartment, everything maximally the same," SHRIKI expressed that she was busy with other full time work. Instead, SHRIKI advised BARDAKOVA on these tasks, sending BARDAKOVA the addresses of the hospital used for VORONINA's first birth, the apartment address, the name of the doctor, and advice on how to use a realtor. BARDAKOVA then travelled to the United States and coordinated the arrangements for VORONINA's planned stay, including a charter flight for VORONINA to fly into the United States, a rented house in Beverly Hills, and potential appointments with the same obstetrician, all for the benefit of DERIPASKA and VORONINA.

          k.        On or about May 13, 2022, BARDAKOVA traveled to Los Angeles to tour houses potentially to rent for VORONINA and for the benefit of DERIPASKA. On or about May 18, 2022, VORONINA forwarded DERIPASKA a message from BARDAKOVA with

a video of a potential rental. BARDAKOVA's message stated, in part, "if OV agrees, then I would vote for this house as it meets most of the requirements". VORONINA noted to DERIPASKA, "Nataliya found it, but very expensive, we will keep looking". DERIPASKA responded, "now will try to negotiate", prompting a "thank you" from VORONINA.

l.      On or about May 20, BARDAKOVA sent VORONINA a link for a house rental listing in Beverly Hills. VORONINA sent the link to DERIPASKA, stating it was a better option "but they are not moving on price and have two other families ready to rent. How does it look to you?" DERIPASKA responded, "Will inquire." BARDAKOVA then finalized the agreement for the house rental. On or about May 21, 2022, VORONINA forwarded DERIPASKA a message advising, in part, "Our application was selected and confirmed. Now deciding questions of payment". DERIPASKA responded, "Hooray". BARDAKOVA then coordinated approximately $229,000 in payments to intermediaries in Russia in order to have a U.S.-based entity fund the cost of the Beverly Hills house rental.

m.      That same month, in or about May 2020, DERIPASKA and BARDAKOVA arranged for VORONINA's travel on a private jet from Russia to Los Angeles so that she could arrive in the United States in time to give birth to DERIPASKA's and VORONINA's second child and for their benefit. On or about May 25, 2022,

BARDAKOVA sent a message to VORONINA, stating, in part, "The Chief confirmed boarding for June 1. Let's decide on the outgoing flight from Moscow. From Sheremetyevo (so as not to go far) at 10, 11, 12?" VORONINA selected the noon flight time and then asked, "Is the 1st necessary? And what's the plan for the flight times and connections". BARDAKOVA replied, in part, "Oleg Vladimirovich so instructed. Insisting on flight out. Planes very hard to confirm now." VORONINA forwarded BARDAKOVA's message to DERIPASKA and added, "We will fly when you tell us to". DERIPASKA replied, "Looks like flight on the 1st will happen." On June 1, 2022, a Cyprus aviation charter service paid a Swiss charter company approximately 160,000 Euros for a private jet to ferry VORONINA, DERIPASKA's and VORONINA's first child, and a nanny from Istanbul to Los Angeles. On or about June 1, 2022, VORONINA in fact traveled to Los Angeles on the private jet.

### SHRIKI's Deletion of Records and Obstruction of Justice

20. On or about September 23, 2020, a federal grand jury sitting in the Southern District of New York issued a subpoena to OLGA SHRIKI, the defendant, seeking records pertaining to the grand jury's investigation into OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant, and his real estate holdings in the United States (the "Grand Jury Subpoena"). SHRIKI failed to produce and deleted several categories of records responsive to the Grand Jury Subpoena. For example, SHRIKI failed

to produce certain communications regarding facilitating the sale of the Music Studio and making purchases for DERIPASKA. SHRIKI also deleted records responsive to the Grand Jury Subpoena, including text messages between SHRIKI and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendant, coordinating the delivery of the Easter flowers and gifts to the U.S. television host, voice messages between SHRIKI and BARDAKOVA discussing SHRIKI's assistance to EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," the defendant, and screenshots of bank transfers shared between SHRIKI and BARDAKOVA pertaining to funding for Global Consulting to pay for VORONINA's expenses while in the United States. On or about June 15, 2021, after an Assistant United States Attorney notified SHRIKI's attorney that SHRIKI had not produced all records required by the Grand Jury Subpoena, SHRIKI conducted web searches on her phone for "if the client withholds information about sanctions list."

## **VORONINA's and BARDAKOVA's False Statements**

21. On or about June 2, 2022, EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," the defendant, arrived in Los Angeles on a private jet with the first child she had with OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," the defendant. Upon arrival, officers from the U.S. Department of Homeland Security interviewed VORONINA. During those interviews, VORONINA falsely stated that the name of the father of her child

22

and her then-unborn child was "Alec Deribasko."  When subsequently asked whether she knew "Oleg Deripaska," VORONINA stated that she did know him and that he was a friend.  Later, when shown a photo of DERIPASKA, VORONINA stated that the individual depicted in the photo looked like the father of her child.  VORONINA also stated, in substance and in part, that she did not know where her child's father lived or his occupation.  In addition, VORONINA stated, in substance and in part, that her parents had paid for her private jet to arrive in the United States and that her parents had rented her a house in Beverly Hills for her to stay while in the United States.

22.  On or about June 3, 2022, Special Agents from the Federal Bureau of Investigation met NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendant, at the Los Angeles airport where she was waiting to pick up EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," the defendant, after VORONINA's arrival on the private jet BARDAKOVA had helped arrange. The agents accompanied BARDAKOVA back to her hotel where they interviewed her in the lobby.  During the interview, BARDAKOVA acknowledged, in substance and in part, that she had traveled to the United States to facilitate arrangements for VORONINA to give birth in the United States.  But BARDAKOVA also made several materially false statements.  For example, BARDAKOVA falsely stated, in substance and in part, that she had never communicated

23

with DERIPASKA directly.   BARDAKOVA also falsely stated, in substance and in part, that she did not assist VORONINA with VORONINA's trip in 2020 to give birth to her first child with DERIPASKA and, specifically, did not send any money from BARDAKOVA's accounts for expenses associated with that trip. BARDAKOVA also falsely stated, in substance and in part, that she had never visited DERIPASKA's property located at 12 Gay Street, New York, New York.

### COUNT ONE
**(Conspiracy to Violate the International Emergency Economic Powers Act)**

The Grand Jury further charges:

23.   The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

24.   From at least in or about April 2018 through in or about the present, in the Southern District of New York and elsewhere, OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," OLGA SHRIKI, and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendants, and others known and unknown, did combine, conspire, confederate, and agree together and with each other to violate the IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

25.   It was a part and an object of the conspiracy that

OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," OLGA SHRIKI, and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendants, and others known and unknown, would and did violate, attempt to violate, and cause a violation of a license, order, regulation, and prohibition issued under the IEEPA.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662; Title 31, Code of Federal Regulations § 589.201.)

## COUNT TWO
### (Destruction of Records)

The Grand Jury further charges:

26. The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

27. From at least in or about 2020 through at least in or about the present, in the Southern District of New York and elsewhere, OLGA SHRIKI, the defendant, knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in a record, document, and tangible object with the intent to impede, obstruct, and influence a matter within the jurisdiction of a department and agency of the United States, and in relation to and contemplation of such matter, to wit, SHRIKI deleted portions of conversations and images related to her work for OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," after

being served with a Grand Jury Subpoena requiring the production of such records.

(Title 18, United States Code, Sections 1519 and 2.)

### COUNT THREE
### (False Statements)

The Grand Jury further charges:

28. The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

29. On or about June 2, 2022, in the Southern District of New York and elsewhere, NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit, when interviewed by Special Agents from the Federal Bureau of Investigation, BARDAKOVA falsely stated that (1) she never communicated with OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," directly, (2) she had not assisted EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," with VORONINA's trip in 2020 to give birth to her first child with DERIPASKA and, specifically, did not send any money from BARDAKOVA's accounts for expenses associated with that trip, and (3) she had never visited any of DERIPASKA's properties in the United States, when in truth

and in fact, and as BARDAKOVA knew (1) BARDAKOVA regularly communicated directly with DERIPASKA, (2) BARDAKOVA assisted VORONINA with arrangements for VORONINA's 2020 trip to the United States to give birth to DERIPASKA's child and paid for some of VORONINA's expenses related to that trip from BARDAKOVA's bank account, and (3) BARDAKOVA had visited DERIPASKA's property located at 12 Gay Street, New York, New York.

(Title 18, United States Code, Section 1001.)

## COUNT FOUR
### (False Statements)

The Grand Jury further charges:

30. The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

31. On or about June 2, 2022, in the Southern District of New York and elsewhere, EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, to wit, when interviewed by officers from the U.S. Department of Homeland Security, VORONINA falsely stated that her parents had rented her housing accommodations during her intended stay in Los Angeles, California, when in truth and in fact, and as VORONINA knew, OLEG

VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova, the defendants, had rented, approved, and funded her housing.

(Title 18, United States Code, Section 1001.)

### FORFEITURE ALLEGATION

32. As a result of committing the offense alleged in Count One of this Indictment, OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," OLGA SHRIKI, and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offense alleged in Count One, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and the following specific property:

a. Any and all monies and funds previously on deposit at Wells Fargo Bank in account no. 2502560838, held in the name of Ocean Studios LLC, and any and all funds traceable thereto, including accrued interest;

b. The real property located at 2501 30th Street NW, Washington, D.C.;

c. The real property located at 12 Gay

Street, New York, New York; and

           d.        The real property located at 11 East 64th Street, New York, New York.

**Substitute Asset Provision**

        33. If any of the property described above as being subject to forfeiture, as a result of any act or omission of OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," OLGA SHRIKI, and NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," the defendants,

           a.    cannot be located upon the exercise of due diligence;

           b.    has been transferred or sold to, or deposited with, a third party;

           c.    has been placed beyond the jurisdiction of the court;

           d.    has been substantially diminished in value; or

           e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

> (Title 18, United States Code, Sections 981;
> Title 21, United States Code, Section 853;
> Title 28, United States Code, Section 2461.)

FOREPERSON    9/28/22

DAMIAN WILLIAMS
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

OLEG VLADIMIROVICH DERIPASKA, a/k/a "Oleg Mukhamedshin," OLGA SHRIKI, NATALIA MIKHAYLOVNA BARDAKOVA, a/k/a "Natalya Mikhaylovna Bardakova," and EKATERINA OLEGOVNA VORONINA, a/k/a "Ekaterina Lobanova,"

Defendants.

## SEALED INDICTMENT

S1 22 Cr. \_\_\_\_

(50 U.S.C. § 1705; Executive Orders 13660, 13661, and 13662; 31 C.F.R. § 589.201; 18 U.S.C. §§ 1001, 1519, & 2.)

DAMIAN WILLIAMS
United States Attorney.

Foreperson.

9/28/22

9/28/22  Filed indictment   Warrant issues

Copy USAO

# EXHIBIT B

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA            :     SEALED INDICTMENT

      -v.-                   :     22 Cr.

GRAHAM BONHAM-CARTER,         22 CRIM 303

        Defendant.     :
:
- - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury charges:

### The Defendant

1.    From at least in or about 2003 through in or about the present, GRAHAM BONHAM-CARTER, the defendant, worked as a manager for several real estate properties around the world owned by Oleg Vladimirovich Deripaska, a Russian national who has been subject to economic sanctions in the United States since April 2018. Despite knowledge of those sanctions, BONHAM-CARTER continued to provide services to and for the benefit of Deripaska in connection with real estate and artwork located in the United States after Deripaska was sanctioned.

### The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations

2.    The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-

1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

3. In 2014, pursuant to his authorities under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to the situation in Ukraine. To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or that were then or thereafter came within the possession or control of any United States person, of individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria include, but are not limited to, individuals determined to be responsible for or complicit in, or who engage in, actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, the making of any contribution or provision of funds, goods, or services by, to,

or for the benefit of any person whose property and interests in property are blocked, and the receipt of any contribution or provision of funds, goods, or services from any such person.

4.   The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2021.

5.   The President twice expanded the scope of the national emergency declared in Executive Order 13660, through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders."

6.   The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury

3

to redelegate any of these functions to other offices and agencies of the United States Government.

       7.    To implement the Ukraine-Related Executive Orders, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the definition of prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals ("SDN") and Blocked Persons List (the "SDN List"), which is published on OFAC's public website. *Id.* n.1.

       8.    According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of

whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

9. On or about April 6, 2018, OFAC designated Deripaska as an SDN pursuant to the Ukraine-Related Executive Orders. Deripaska was designated pursuant to Executive Order 13661 for having acted or purported to act for or on behalf of, directly or indirectly, a senior official of the Government of the Russian Federation, as well as pursuant Executive Order 13662 for operating in the energy sector of the Russian Federation economy.

## BONHAM-CARTER's Work for Deripaska Post-Sanctions

10. Beginning in or about July 2003 up to in or about the present, GRAHAM BONHAM-CARTER, the defendant, has worked for entities controlled by Deripaska. Among other things, BONHAM-CARTER manages Deripaska's residential properties located in the United Kingdom and Europe, including a house in Belgravia Square, London.

11. Even after OFAC designated Deripaska, BONHAM-CARTER continued to work for Deripaska and refer to Deripaska as his "boss." GRAHAM-CARTER was aware of the sanctions on Deripaska. For example:

  a. In an email dated on or about June 18, 2018, BONHAM-CARTER wrote: "Times a bit tough for my boss as sanctions have hit him from the USA so not an ideal time."

  b. In an email dated on or about July 17,

5

2018, BONHAM-CARTER wrote: "[T]imes are a little stressful as we as a company are involved in the USA sanctions on Russians."

      c.      In an email dated on or about January 7, 2020, BONHAM-CARTER wrote in response to an inquiry regarding "Mr. Deripaska": "To be honest, now is not the best moment to approach Mr[.] D as life is extremely awkward with USA sanctions, FBI and Homeland interrogations...."

      d.      In an e-mail dated on or about October 13, 2021, Bonham-Carter wrote: "It[']s all good apart from banks keep shutting me down because of my affiliation to my boss Oleg Deripaska.... I have even been advised not to go to the USA where Oleg still has personal sanctions as the authorities will undoubtedly pull me to one side and the questioning could be hours or even days!!"

12. Shortly after OFAC designated Deripaska on or about April 6, 2018, Deripaska instructed GRAHAM BONHAM-CARTER, the defendant, to set up a company to manage Deripaska's properties. On or about May 25, 2018, BONHAM-CARTER wrote in an email that "OVD [*i.e.*, Deripaska] wants me to set up my own company to run the [Belgravia Square] house and to possibly include Japan, Italy, China and more." Less than two months later, on or about July 17, 2018, BONHAM-CARTER incorporated GBCM Limited, which signed a property management agreement to manage Deripaska's real estate holdings in Belgravia Square.

6

## The Sanctions Violations

13.   From at least in or about 2003 through in or about the present, GRAHAM BONHAM-CARTER, the defendant, provided funds, goods, and services to and for the benefit of Deripaska and companies owned and controlled by Deripaska, and received funds, goods, and services from Deripaska. In particular, BONHAM-CARTER continued to engage in this conduct after OFAC had designated Deripaska as an SDN, in violation of the Ukraine-Related Sanctions Regulations.

### BONHAM-CARTER's Funding of the Gracetown Properties

14.   Between in or about 2005 and in or about 2008, Deripaska purchased three residential properties in the United States, two in New York, New York and one in Washington, D.C. (together, the "U.S. Properties"). The properties were managed by a company named Gracetown, Inc.

15.   After OFAC imposed sanctions on Deripaska on or about April 6, 2018, Gracetown, Inc. continued to manage the U.S. Properties for the benefit of Deripaska.

16.   Between in or about March 2021 and in or about December 2021, after OFAC imposed sanctions on Deripaska, GRAHAM BONHAM-CARTER, the defendant, acting on instructions from other employees of Deripaska and entities controlled by Deripaska, transmitted payments for the upkeep of the Gracetown Properties. BONHAM-CARTER wired payments totaling $1,043,964.30 from a bank

7

account in Russia held in the name of BONHAM-CARTER's company, GBCM Limited, to bank accounts held by Gracetown Inc. in New York, New York. Gracetown Inc. used the funds from GBCM Limited to pay for various expenses associated with the Gracetown Properties, including staff salaries, property taxes, and other services, and to maintain and keep up the Gracetown Properties. BONHAM-CARTER transmitted these wires while still in Deripaska's employ.

BONHAM-CARTER's Attempt to Expatriate Deripaska's Artwork

17. On or about April 18, 2008, Deripaska purchased 18 pieces of artwork (the "Artwork") at an auction house located in New York, New York (the "Auction House") through a shell company called Turcos Limited. Deripaska used an intermediary who placed the bid at the Auction House on behalf of Turcos Limited ("Bidder-1"). After Deripaska purchased the Artwork, it was not immediately collected and the Auction House maintained the Artwork at a storage facility in New York City.

18. Between in or about March 2020 and in or about March 2021, after sanctions were imposed on Deripaska, GRAHAM BONHAM-CARTER, the defendant, communicated via email with the Auction House to arrange for the Artwork to be shipped from New York City to London. On or about March 24, 2021, BONHAM-CARTER made a $12,146.85 payment to the Auction House to cover shipping costs.

19. On or about May 25, 2021, the Auction House sent GRAHAM BONHAM-CARTER, the defendant, a letter advising him that

8

the Auction House had reason to believe that the Artwork belonged to Deripaska, who had been sanctioned by the United States. The Auction House requested written confirmation within 30 days that the Artwork, as well as the $12,146.85 payment to ship the Artwork, did not belong to Deripaska. In addition, the Auction House informed BONHAM-CARTER that without such confirmation, the Auction House would "block" the property, consistent with OFAC's requirements. The Auction House also requested documentation that BONHAM-CARTER was authorized to act on behalf of Turcos Limited.

20. On or about June 21, 2021, GRAHAM BONHAM-CARTER, the defendant, emailed the Auction House a copy of his credit card statement, which showed that BONHAM-CARTER had used his own credit card to make the $12,146.85 payment (the "Credit Card Statement"). In the cover email, BONHAM-CARTER stated, "The funds and the property do not belong to Mr[.] Deripaska. I am in the process of collating documentation showing ownership of the underlying assets (as well as documentation in connection with my authorization to communicate with [the Auction House] with respect to this account)."

21. In truth and in fact, GRAHAM BONHAM-CARTER, the defendant, understood that Deripaska had purchased the Artwork, that the Artwork remained Deripaska's property, and that the funds used to pay for shipping would be billed to Deripaska. BONHAM-CARTER's email communications reflect his knowledge. For example,

on or about June 21, 2021, BONHAM-CARTER emailed himself a scanned copy of the Credit Card Statement along with a cover sheet that stated that the payment to the Auction House was for "OVD House." In addition, on or about April 16, 2020, BONHAM-CARTER sent an email to a financial services firm, writing: "We have a large purchase of artwork sitting with [the Auction House] in NY and purchased under the name of Turcos way back in April 2008. [Bidder-1] was the bidder at the auction and I understand from [Bidder-1] that no one now wants or maybe can deal with Turcos admin as its seen as a very 'Hot cake' vis a vis OVD [*i.e.*, Deripaska] and the USA." Moreover, on or about January 22, 2021, in attempting to obtain a payment for Bidder-1 for his services to Deripaska over the course of several years, BONHAM-CARTER assured another employee of Deripaska that Bidder-1 was not intending to "blackmail[] someone as powerful and eminent as OVD."

22. In or about June and July 2021, GRAHAM BONHAM-CARTER, the defendant, asked the Auction House for two extensions to provide the paperwork requested. On or about August 27, 2021, after the second extension had lapsed without BONHAM-CARTER providing any supporting documents, the Auction House notified OFAC, in substance, that it was treating both the Artwork and the

$12,146.85 paid by BONHAM-CARTER as property of Deripaska, and therefore subject to sanctions, pursuant to OFAC regulations.

## Statutory Allegations

23. From at least in or about 2020 through at least in or about 2021, in the Southern District of New York and elsewhere, GRAHAM BONHAM-CARTER, the defendant, and others known and unknown, did combine, conspire, confederate, and agree together and with each other to violate IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

24. It was a part and an object of the conspiracy that GRAHAM BONHAM-CARTER, the defendant, and others known and unknown, would and did violate, attempt to violate, and cause a violation of a license, order, regulation, and prohibition issued under IEEPA.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, Title 31, Code of Federal Regulations § 589.201; and Title 18, United States Code, Section 2.)

## COUNT TWO
**(Violation of the International Emergency Economic Powers Act)**

The Grand Jury further charges:

25. The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

26. From at least in or about 2020 through at least in or about 2021, in the Southern District of New York and elsewhere,

11

GRAHAM BONHAM-CARTER, the defendant, violated, attempted to violate, and caused a violation of a license, order, regulation, and prohibition issued under IEEPA, to wit: BONHAM-CARTER willfully and knowingly provided and caused others to provide funds, goods, and services to and for the benefit of Oleg Vladimirovich Deripaska, whom OFAC had listed as an SDN, and companies owned and controlled by Deripaska, and received funds, goods, and services from Deripaska, without first having obtained the required approval of OFAC, and evaded and avoided the requirements of United States law with respect to the provision of funds, goods, and services to and for the benefit of Deripaska, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, Title 31, Code of Federal Regulations § 589.201; and Title 18, United States Code, Section 2.)

## COUNT THREE
## (Wire Fraud)

The Grand Jury further charges:

27. The allegations set forth above in Paragraphs 1 through 22 are realleged and incorporated by reference as if set fully forth herein.

28. From in or about 2020 through in or about 2021, in the Southern District of New York and elsewhere, GRAHAM BONHAM-CARTER, the defendant, knowingly having devised and intending to

devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BONHAM-CARTER engaged in a scheme to deceive the Auction House to obtain property subject to U.S. sanctions, namely, the Artwork, by misrepresenting the true ownership of the Artwork and source of funds sent to the Auction House to cover shipping costs, which scheme involved the use of wires, including interstate wires into the Southern District of New York.

(Title 18, United States Code, Section 1343 and 2.)

### FORFEITURE ALLEGATION

29. As a result of committing one or more of the offenses alleged in Count One, Count Two, and Count Three of this Indictment, GRAHAM BONHAM-CARTER, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Count One, Count Two, and Count Three, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of

13

said offenses.

## Substitute Asset Provision

30. If any of the property described above as being subject to forfeiture, as a result of any act or omission of GRAHAM BONHAM-CARTER, the defendant,

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek forfeiture of any other property of the

14

defendant up to the value of the forfeitable property described
above.

> (Title 18, United States Code, Sections 981;
>  Title 21, United States Code, Section 853;
>  Title 28, United States Code, Section 2461.)

FOREPERSON   9/21/22

DAMIAN WILLIAMS
United States Attorney

15

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

### -v.-

### GRAHAM BONHAM-CARTER,

### Defendant.

### SEALED INDICTMENT

22 Cr. ____

(50 U.S.C. § 1705; Executive Orders 13,660, 13,661, and 13,662; 31 C.F.R. § 589.201; 18 U.S.C. §§ 1343 & 2.)

DAMIAN WILLIAMS
United States Attorney.

Foreperson.
9/21/22

9/21/22

Filed Indictment under seal
Arrest warrant issued

(S.U) Figueredo